UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                    :

BREEANNE BUCKLEY PENI, individually  :
and on behalf of all others similarly :
situated,                          :      22cv5443 (DLC)
                                    :
                Plaintiff,    :     OPINION AND ORDER
          -v-                  :
                                    :
DAILY HARVEST, INC.,              :
                                  :
                Defendant.    :
                                  :
------------------------------------- X

APPEARANCES

For plaintiff Breeanne Buckley Peni:
Joseph Edward O'Connor
O'Connor & Partners, PLLC
255 Wall Street
Kingston, NY 12401

James Rocco Peluso, Jr.
Dreyer Boyajian LLP
75 Columbia Street
Albany, NY 12210

For defendant Daily Harvest, Inc.:
Jeffrey S. Jacobson
Faegre Drinker Biddle & Reath LLP
1177 Avenue of the Americas, 41st Floor
New York, NY 10036

Justin Micheal Ginter
Faegre Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932

DENISE COTE, District Judge:

     Plaintiff Breeanne Buckley Peni initiated this products

liability action after becoming hospitalized with

gastrointestinal illness when she consumed a food product sold by defendant Daily Harvest, Inc. ("Daily Harvest").  Daily Harvest has moved to compel arbitration.  For the following reasons, the motion is granted.

## Background

The following facts are taken from the first amended complaint ("FAC") and the evidence that was submitted in connection with Daily Harvest's motion to compel arbitration.  This Opinion summarizes only those facts relevant to the instant motion.

Daily Harvest is a direct-to-consumer food brand that sells weekly and monthly meal subscriptions.  In April 2022, Daily Harvest began selling a new plant-based line of foods, which included the product at issue in this case, "French Lentil + Leek Crumbles" (the "Product").  On or about June 19, Daily Harvest stated on its website that it had received reports of the Product causing gastrointestinal problems.

On May 8, 2022, Peni registered for an account with Daily Harvest and, on May 22, she purchased the Product.  After consuming the Product, she was hospitalized with gastrointestinal illness.  She filed this action on behalf of

herself and others similarly situated on June 27.[1]  Peni brings claims for strict liability, negligence, and breach of express and implied warranties.  On July 27, Daily Harvest moved to compel arbitration based on an agreement allegedly entered into between Peni and Daily Harvest.  The motion became fully submitted on September 26.[2]

In connection with its motion to compel arbitration, Daily Harvest submitted a declaration from its Chief Supply Chain Officer, Ricky Silver, (the "Silver Declaration") outlining the steps Peni needed to take to create an account and place an order.  The Silver Declaration includes descriptions and screenshots of both the website and mobile application interfaces, which are the only methods by which a user can register for an account and order from Daily Harvest.

To create an account, a user entered an email address and ZIP code and then clicked a button labeled either "Let's Go" (if

---

[1] Subject matter jurisdiction is premised on the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Peni alleges that the class has more than 100 putative class members, at least some of whom are diverse from defendants, and the amount in controversy exceeds $5,000,000, exclusive of costs and interests.

[2] On August 17, Peni amended her complaint, adding defendants Second Bite Foods, Inc. (doing business as Stone Gate Foods) ("Stone Gate") and five "John Doe Entities."  Stone Gate waived service on September 20.  Stone Gate's deadline to answer is November 21.

she created her account through the website) or "View Plans +
Pricing" (if she created her account through the mobile
application).  Directly below each of these buttons was a
disclosure in dark text against a white background.  The text of
the disclosure was roughly the same size as the words on the
registration buttons.  The disclosure stated: "By clicking
above, you agree to our Terms of Use and Terms of Sale and
consent to our Privacy Policy."  The underlined phrases in the
disclosure were hyperlinks to the relevant documents outlining
the Terms of Use, Terms of Sale, and the Privacy Policy.

The Terms of Use in effect at the time of Peni's order of
the Product stated:

> **PLEASE READ THESE TERMS CAREFULLY.  These Terms
> include information about future changes to these
> Terms, automatic renewals, limitations of liability, a
> class action waiver and resolution of disputes by
> arbitration instead of in court.**  PLEASE NOTE THAT
> YOUR USE OF AND ACCESS TO OUR SERVICES ARE SUBJECT TO
> THE FOLLOWING TERMS; IF YOU DO NOT AGREE TO ALL OF THE
> FOLLOWING, YOU MAY NOT USE OR ACCESS THE SERVICES IN
> ANY MANNER.
>
> **ARBITRATION NOTICE AND CLASS ACTION WAIVER:** NOTE THAT
> SECTION 18 OF THE TERMS OF USE CONTAINS A MANDATORY
> ARBITRATION PROVISION, AND EXCEPT FOR CERTAIN TYPES OF
> DISPUTES DESCRIBED IN THAT SECTION, YOU AGREE THAT
> DISPUTES BETWEEN YOU AND US WILL BE RESOLVED BY
> BINDING, INDIVIDUAL ARBITRATION AND YOU WAIVE YOUR
> RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR
> CLASS-WIDE ARBITRATION.

Section 18 of the Terms of Use reads in relevant part:

**18.1 Arbitration Rules; Applicability of Arbitration Agreement.**  The parties shall use their best efforts to settle any dispute, claim, question, or disagreement arising out of or relating to the subject matter of these Terms directly through good-faith negotiations, which shall be a precondition to either party initiating arbitration.  If such negotiations do not resolve the dispute, it shall be finally settled by binding arbitration in New York.  The arbitration will proceed in the English language, in accordance with the JAMS Streamlined Arbitration Rules and Procedures (the "Rules") then in effect, by one commercial arbitrator with substantial experience in resolving intellectual property and commercial contract disputes.  The arbitrator shall be selected from the appropriate list of JAMS arbitrators in accordance with such Rules.  Judgement upon the award rendered by such arbitrator may be entered in any court of competent jurisdiction.

After creating an account, a user also needed to follow certain steps to place an order.  These steps included pressing a button labeled "Place Order" after selecting the products the user wanted to purchase.  Directly above the "Place Order" button was a check-box, which was unchecked by default, next to the statement "I've read and accept the terms & conditions*."  The underlined phrase contained a hyperlink.  It is not clear from the record whether clicking on the "terms & conditions*" hyperlink opens the Terms of Use or opens a document labeled Terms of Sale, which itself contains a hyperlink to the Terms of Use.

## Discussion

When deciding motions to compel arbitration, courts may
apply a standard "similar to that applicable for a motion for
summary judgment." Barrows v. Brinker Rest. Corp., 36 F.4th 45,
49 (2d Cir. 2022) (citation omitted).  On a motion to compel
arbitration, courts therefore consider "all relevant, admissible
evidence submitted by the parties and contained in pleadings,"
including affidavits, and draw all reasonable inferences in
favor of the non-moving party. Meyer v. Uber Techs., Inc., 868
F.3d 66, 74 (2d Cir. 2017) (citation omitted).  "Where the
undisputed facts in the record require the matter of
arbitrability to be decided against one side or the other as a
matter of law, [courts] may rule on the basis of that legal
issue and avoid the need for further court proceedings." Id.
(citation omitted).

I.   Agreement to Arbitrate

The Federal Arbitration Act ("FAA") provides:

A written provision in . . . a contract evidencing a
transaction involving commerce to settle by
arbitration a controversy thereafter arising out of
such contract or transaction . . . shall be valid,
irrevocable, and enforceable, save upon such grounds
as exist at law or in equity for the revocation of any
contract.

9 U.S.C. § 2.  The FAA establishes a "liberal federal policy
favoring arbitration agreements," requiring courts "rigorously

6

to enforce arbitration agreements according to their terms."
Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1621 (2018) (citation
omitted).

"In deciding whether to compel arbitration, a court must
first decide whether the parties agreed to arbitrate."  Zachman
v. Hudson Valley Fed. Credit Union, 49 F.4th 95, 101 (2d Cir.
2022).  Only if the court determines that an agreement to
arbitrate exists can it proceed to consider other questions such
as the scope of the agreement and whether a particular claim
falls within the agreement.  Id.  "In interpreting a validly
formed arbitration agreement, [courts] apply a presumption of
arbitrability if the arbitration agreement is ambiguous about
whether it covers the dispute at hand."  Lloyd v. J.P. Morgan
Chase & Co., 791 F.3d 265, 269 (2d Cir. 2015) (citation
omitted).  This presumption, however, does not apply to the
threshold question of whether the parties agreed to arbitrate at
all, which "is strictly a matter of consent."  Granite Rock Co.
v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299 (2010) (citation
omitted).  "In other words, while doubts concerning the scope of
an arbitration clause should be resolved in favor of
arbitration, the presumption does not apply to disputes
concerning whether an agreement to arbitrate has been made."

Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth., 764 F.3d 210, 215 (2d Cir. 2014) (citation omitted).

The threshold question of whether the parties agreed to arbitrate "is governed by state-law principles of contract formation." Starke v. SquareTrade, Inc., 913 F.3d 279, 288 (2d Cir. 2019). Under New York law,[3] "in order to be binding, a contract requires a meeting of the minds and a manifestation of mutual assent." Id. (citation omitted). This manifestation "must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." Id. at 289.

"Generally, courts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." Id. "Where there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms." Meyer, 868 F.3d at 74-75. The inquiry notice question "often turns on whether the contract terms were presented to the offeree in a

---

[3] The Terms of Use state that they "are governed by and will be construed under the Federal Arbitration Act, applicable federal law, and the laws of New York, without regard to the conflicts of laws provisions thereof." The parties agree that New York contract law applies.

8

clear and conspicuous way." Starke, 913 F.3d at 289.  In the
context of web-based contracts, courts "look to the design and
content of the relevant interface to determine if the contract
terms were presented to the offeree in a way that would put her
on inquiry notice of such terms." Zachman, 49 F.4th at 102
(citation omitted).  "[I]nsofar as it turns on the
reasonableness of notice, the enforceability of a web-based
agreement is clearly a fact-intensive inquiry." Id. (citation
omitted).

Two illustrative cases, Nicosia v. Amazon.com, Inc., 834
F.3d 220 (2d Cir. 2016), and Meyer v. Uber Technologies, Inc.,
868 F.3d 66 (2d Cir. 2017), frame this inquiry.  In Nicosia, the
court decided that the issue of inquiry notice for terms and
conditions on an Amazon.com web interface could not be
determined as a matter of law.  Several features of the
interface were relevant to the analysis, including: (1) the
warning message indicating that customers would be subject to
the terms and conditions was "not bold, capitalized, or
conspicuous in light of the whole webpage"; (2) "numerous other
links on the webpage, in several different colors, fonts, and
locations, generally obscured the message"; (3) "multiple
buttons and promotional advertisements on the order page drew
attention away from the message"; and (4) "the presence of

9

customers' personal address, credit card information, shipping options, and purchase summary [we]re sufficiently distracting so as to temper whatever effect the notification ha[d]." Nicosia, 834 F.3d at 237.

In Meyer, by contrast, the court concluded that a customer had received inquiry notice of terms presented when the customer signed up for a smartphone-based service with Uber Technologies, Inc. ("Uber").  The court noted various features of the relevant interface that distinguished the case from Nicosia.  These included: (1) that the screen was "uncluttered, with only fields for the user to enter his or her credit card details, buttons to register for a user account or to connect the user's pre-existing [payment accounts] to the Uber account, and the warning that 'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY'"; (2) that the warning was "spatially coupled" with the registration button because "[t]he text, including the hyperlinks to the Terms and Conditions and Privacy Policy, appear[ed] directly below the buttons for registration"; (3) that "[t]he entire screen [wa]s visible at once, and the user d[id] not need to scroll beyond what [wa]s immediately visible to find notice" of the terms; (4) that the registration button was "temporally coupled" with the relevant terms in that the hyperlinks containing the terms were provided upon the

user's registration with Uber, which "connect[ed] the contractual terms to the services to which they apply"; and (5) that the language, "[b]y creating an Uber account, you agree," was "a clear prompt directing users to read the Terms and Conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms."  Meyer, 868 F.3d at 78.  "The reasoning of Nicosia and Meyer provides the framework within which [courts] analyze the validity of assent to terms and conditions presented through a web interface."  Starke, 913 F.3d at 292.[4]

Here, under the Meyer-Nicosia framework, Peni was on inquiry notice of the arbitration provision and manifested her assent to the provision by registering for an account with Daily Harvest.  To create an account, Peni needed to access either the website sign-up page or the mobile application sign-up page.  Both interfaces are uncluttered, with only fields for the user to enter her ZIP code and email address, coupled with a warning

---

[4] The Nicosia court applied Washington law and the Meyer court applied California law.  See Nicosia, 834 F.3d at 231; Meyer, 868 F.3d at 74.  But the Second Circuit applied New York law in Starke using the Meyer-Nicosia framework and noted that New York, California, and Washington law are all substantially similar regarding the question of mutual assent.  See Starke, 913 F.3d at 288-89, 290 n.7, 291 n.8.  Thus, the Meyer-Nicosia framework applies in this action involving New York contract law.  See also Zachman, 49 F.4th at 102-03 (applying Meyer and Nicosia in a case governed by New York contract law).

that "[b]y clicking above, you agree to our Terms of Use and Terms of Sale, and consent to our Privacy Policy."  The dark text presenting the warning is set off from the light background and is written in a font roughly the same size as that of the primary text on the page.  The relevant terms are accessible through underlined hyperlinks, and the user does not need to scroll beyond the main text of the screen to locate the hyperlinks.  Additionally, the warning text, including the hyperlinks to the relevant terms, appears directly below the button used to register with Daily Harvest and is therefore spatially coupled with the button.  The button is also temporally coupled with the terms because the terms are presented as a user is signing up for a Daily Harvest account. And finally, the language of the warning is a clear prompt directing users to review the Terms of Use, Terms of Sale, and Privacy Policy.

For all these reasons, the Daily Harvest registration interface falls comfortably on the Meyer side of the Meyer-Nicosia framework.  Accordingly, Peni was on inquiry notice of the Terms of Use when she accessed Daily Harvest's registration page.  Peni then manifested assent to the Terms of Use by clicking the registration button and creating an account with Daily Harvest.  Among the terms to which Peni manifested assent

12

was the agreement to arbitrate disputes contained within the
Terms of Use.[5]

Peni's argument to the contrary is unavailing.  Peni
contends that there are fact issues surrounding the layout of
the interface because the Silver Declaration includes
screenshots of the current interface, rather than screenshots of
the interface that existed when she purchased the Product a few
months ago.  But the Silver Declaration explains that "the only
difference between the current appearance of [the registration
page] and the appearance at the time Ms. Peni created her Daily
Harvest account is that" what previously appeared as a single
hyperlink to Daily Harvest's Terms of Sale and Terms of Use
currently appears as two hyperlinks.  This does not change the
analysis, which is based on the overall layout of the interface.
Peni does not dispute that the screenshots and description
accurately reflect the interface she used to register with Daily
Harvest even if the currently separated hyperlinks were
previously combined into a single link.  Accordingly, there is
no meaningful factual dispute that the interface Peni used to

_____

[5] Because Peni manifested her assent to the Terms of Use when she
registered with Daily Harvest, it is not necessary to decide
whether she assented to the terms a second time by placing her
first order.

create an account with Daily Harvest put her on inquiry notice
of the Terms of Use, including the arbitration provision.

II.  Arbitrability

When a court decides that an agreement to arbitrate exists,
the next question is whether the parties' specific dispute falls
within the scope of that arbitration agreement.  "When the
parties' contract delegates the arbitrability question to an
arbitrator, the courts must respect the parties' decision as
embodied in the contract."  Henry Schein, Inc. v. Archer & White
Sales, Inc., 139 S. Ct. 524, 528 (2019).  To determine whether
the parties delegated the question of arbitrability to an
arbitrator, there must be "clear and unmistakable evidence" that
the parties intended to do so.  DDK Hotels, LLC v. Williams-
Sonoma, Inc., 6 F.4th 308, 317 (2d Cir. 2021) (citation
omitted).

Whether there is clear and unmistakable evidence of the
parties' intent to arbitrate arbitrability may turn, in part, on
whether the arbitration agreement expressly incorporates
"procedural rules that empower an arbitrator to decide issues of
arbitrability."  Id. at 318.  But "[i]ncorporation of such rules
into an arbitration agreement does not, per se, demonstrate
clear and unmistakable evidence of the parties' intent to
delegate threshold questions of arbitrability to the arbitrator

14

where other aspects of the contract create ambiguity as to the parties' intent."  Id.

> [W]here the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this -- coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability -- constitutes clear and unmistakable evidence of the parties' intent to delegate the threshold question of arbitrability.

Id. at 318-19.  Where, however, "the arbitration agreement is narrower, vague, or contains exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes," rule incorporation, "standing alone, does not suffice to establish the requisite clear and unmistakable inference of intent to arbitrate arbitrability."  Id. at 319.

Here, the arbitration provision states that arbitration will proceed "in accordance with the JAMS Streamlined Arbitration Rules and Procedures then in effect" for arbitration (the "JAMS Rules").  The JAMS Rules provide:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator.  The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

2021 JAMS Streamlined Arb. R. & P. 8(c) (emphases added).
Additionally, the arbitration provision states that "any dispute . . . arising out of or relating to the subject matter

15

of these Terms . . . shall be finally settled by binding
arbitration in New York."  (Emphasis added.)  Thus, the broad
arbitration agreement, coupled with the incorporation of rules
empowering the arbitrator to determine questions of
arbitrability constitute clear and unmistakable evidence that
the parties agreed to delegate the arbitrability question.

Peni's arguments on whether the parties agreed to arbitrate
issues of arbitrability fail.  First, Peni argues that the
arbitration clause is narrow, which would require the issue of
arbitrability to be decided by the Court.  Not so.  Peni points
to language in the Terms of Use noting that certain disputes are
not subject to arbitration.  The relevant language reads:

> EXCEPT FOR CERTAIN DISPUTES DESCRIBED IN [Section 18
> of the Terms of Use], YOU AGREE THAT DISPUTES BETWEEN
> YOU AND US WILL BE RESOLVED BY BINDING, INDIVIDUAL
> ARBITRATION AND YOU WAIVE YOUR RIGHT TO PARTICIPATE IN
> A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION.

The disputes described in Section 18 that are not subject to
arbitration are limited, however, to two types: (1) Daily
Harvest users "may assert claims, if they qualify, in small
claims court in New York or any United States county" where the
user lives or works, and (2) users and Daily Harvest both "have
the right to pursue injunctive or other equitable relief at any
time, from any court of competent jurisdiction, to prevent the
actual or threatened infringement, misappropriation or violation

16

of a party's copyrights, trademarks, trade secrets, patents, or other intellectual property rights."  All other disputes relating to the Terms of Use are subject to binding arbitration.

Far from showing that the arbitration clause is narrow and covers only a limited subset of disputes, these specific inclusions constitute minor carveouts from an otherwise broad arbitration clause.  Contrast, e.g., DDK Hotels, LLC, 6 F.4th at 320 (finding clause narrow where it applied only to "Disputed Matters," which were specifically defined in the relevant agreement as matters "requiring Board or Member approval"); LJL 33rd St. Assocs., LLC v. Pitcairn Properties, Inc., 725 F.3d 184, 192 (2d Cir. 2013) (finding arbitration clause narrow where it stated that it applied only to provisions of a contract that "specifically provide[d]" for resolution by arbitration). Moreover, Peni's personal injury claims do not arguably fall within these exclusions from the arbitration provision. Contrast NASDAQ OMX Group, Inc. v. UBS Secs., LLC, 770 F.3d 1010, 1031-32 (finding ambiguity about the parties' intent to delegate questions of arbitrability where an otherwise broad arbitration clause was "subject to a qualifying provision that at least arguably cover[ed] the present dispute").

Second, Peni, citing Vargas v. Delivery Outsourcing, LLC, No. 15-CV-03408-JST, 2016 WL 946112 (N.D. Cal. Mar. 14, 2016),

argues that the delegation of arbitrability is ambiguous because the arbitration agreement permits litigation in a court of law if a class action waiver in the arbitration agreement is deemed unenforceable.  Vargas is not applicable here.  The key to the Vargas court's analysis was the agreement's express empowerment of "a court of law or equity" to rule on enforceability of parts of the contract.  Id. at *6.  Here, by contrast, the relevant provision of the Terms of Use states that claims may be litigated in court if the "waiver of class or consolidated actions is deemed invalid or unenforceable."  (Emphasis added.) Nowhere does this provision empower a court to rule on the validity or enforceability of the agreement.  Thus, Vargas is inapplicable, and the enforceability of the class action waiver (and the rest of the Terms of Use) is a question for the arbitrator to decide.

Third, Peni argues that the delegation of arbitrability through incorporation of the JAMS Rules should not be enforced against Peni because she is an unsophisticated customer.  Peni's argument is based on a single district court case from the Ninth Circuit that is presently on appeal, MacClelland v. Cellco P'ship, No. 21-cv-08592-EMC, 2022 WL 2390997 (N.D. Cal. July 1, 2022).  As the Ninth Circuit itself has noted, however, "the vast majority of the circuits that hold that incorporation of

[arbitration rules empowering the arbitrator to decide
arbitrability] constitutes clear and unmistakable evidence of
the parties' intent do so without explicitly limited that
holding to sophisticated parties or to commercial contracts."
Brennan v. Opus Bank, 796 F.3d 1125, 1130-31 (9th Cir. 2015)
(collecting cases).  Although the Second Circuit has not
addressed whether the import of rule incorporation differs based
on the parties' sophistication, other circuits appear to apply
the same rule even to unsophisticated parties.  See, e.g., Attix
v. Carrington Mortgage Servs., LLC, 35 F.4th 1284, 1298 (11th
Cir. 2022); Bossé v. N.Y. Life Ins. Co., 992 F.3d 20, 29 (1st
Cir. 2021); Ciccio v. SmileDirectClub, LLC, 2 F.4th 577, 583
(6th Cir. 2021); Dish Network L.L.C. v. Ray, 900 F.3d 1240,
1246-48 (10th Cir. 2018).  Given the federal policy favoring
arbitration and the clear notice of the Terms of Use presented
by the Daily Harvest web interface, this Court finds that the
parties have delegated questions of arbitrability to the
arbitrator through incorporation of the JAMS Rules.

III. Arbitrability of Personal Injury Claims

    Finally, Peni argues that different portions of the Terms
of Use are unconscionable, against public policy, or otherwise
unenforceable.  None of these arguments, however, is directed to
the antecedent agreement to arbitrate.  Instead, Peni's

arguments are directed to the arbitrability of Peni's personal injury claim.  For example, Peni argues that she paid inadequate consideration to support "arbitration of her personal injury claim" and that the agreement improperly limits damages for personal injury claim.  She also contends that arbitration procedures are inappropriately wasteful and dilatory because they could require multiple plaintiffs to produce "medical records" or "submit to an independent medical examination." Finally, she argues that the agreement imposes unfair costs for arbitration because the alleged damages for her personal injury claim exceed the threshold amount below which Daily Harvest agreed to pay arbitration costs.  Each of these attacks is about the enforceability of an agreement to arbitrate Peni's personal injury claim; they are not attacks on the enforceability of an agreement to arbitrate arbitrability.  As a result, they are matters to be decided by the arbitrator.

Peni, relying on Gingras v. Think Finance, Inc., 922 F.3d 112, 128 (2d Cir. 2019), argues that the agreement is so permeated by unconscionability that the agreement to arbitrate cannot be severed from the other allegedly unenforceable provisions.  But Gingras is inapposite.  In Gingras, the parties made a "specific attack" on the provision of an arbitration agreement that delegated issues of arbitrability to the

arbitrator.  Id. at 126.  That is not the case here.  Although Peni labels her arguments as attacking the delegation of arbitrability, they are directed to the arbitration of her personal injury claim.

## Conclusion

Daily Harvest's July 27 motion to compel arbitration is granted.

Dated:      New York, New York
            November 10, 2022

                                    _____
                                    DENISE COTE
                                    United States District Judge

21