UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

BREANNE BUCKLEY PENI, et al.,

Plaintiffs,

v. 22 CV 05443

DAILY HARVEST, INC., et al.,

Defendants.

Conference

------------------------------x

New York, N.Y.
October 15, 2024
3:00 p.m.

Before:

HON. DENISE COTE,

District Judge

APPEARANCES

O'CONNOR & PARTNERS, PLLC
Attorney for Plaintiffs
BY: JOSEPH EDWARD O'CONNOR

DREYER BOYAJIAN, LLP
Attorney for Plaintiffs
BY: JAMES ROCCO PELUSO, JR.

MARLER CLARK, LLP PS
Attorney for Plaintiffs
BY: WILLIAM MARLER

HEISMAN NUNES & HULL, LLP
Attorney for Plaintiffs
BY: PAUL VINCENT NUNES

FAEGRE DRINKER BIDDLE & REATH, LLP
Attorneys for Defendant Daily Harvest, Inc.
BY: JEFFREY S. JACOBSON

APPEARANCES, Continued:

WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
Attorneys for Second Bite Foods, Inc.
BY: JOSEPH BAIOCCO
BRYAN THOMAS VANNINI

HAWORTH BARBER & GERSTMAN, LLC
Attorneys for Smirks, Ltd.
BY: JENNIFER BRUDER

ALSO PRESENT:

NIDEL & NACE
Attorneys for Objector Julie Watson
BY: JONATHAN B. NACE
WILLIAM W. COWLES II

EDGAR GENTLE, Settlement Administrator

(Case called)

THE DEPUTY CLERK: Who is appearing for plaintiff Peni?

MR. MARLER: William Marler, for the plaintiff. Mr. Nunes is here to my left.

MR. PELUSO: James Peluso, for the plaintiff.

MR. O'CONNOR: And Joe O'Connor.

MR. MARLER: We also have Ed Gentle, claims administrator. And we also have Ms. Peni in the back. And we also have Ms. Corey, who happens to be from Brooklyn and decided to come watch.

THE COURT: Thank you so much. Welcome all.

THE DEPUTY CLERK: For defendant Daily Harvest.

MR. JACOBSON: Good afternoon, your Honor. Jeffrey Jacobson, Faegre Drinker, for Daily Harvest.

MR. BAIOCCO: Good afternoon, your Honor. Joseph Baiocco and Bryan Vannini.

THE DEPUTY CLERK: For defendant Smirks.

MS. BRUDER: Good afternoon, your Honor. Jennifer Bruder, from the law firm of Haworth Barger & Gerstman, on behalf of Smirks Ltd.

THE DEPUTY CLERK: For objector Julie Watson?

MR. NACE: Good afternoon, Jonathan Nace and Will Cowles, for Ms. Watson.

THE COURT: Thank you.

Is there anyone here on behalf of our fourth defendant?

I am not hearing anyone appear. Thank you.

This is a fairness hearing on a settlement class action, and I thought I would hear first from our objector, Ms. Watson and her counsel, Mr. Nace.

I would then address the objection from Ms. Reese. She asked to appear today. It's been docketed, but we received notice this morning of a request she made to appear remotely. I denied that request to appear remotely, and that denial has been docketed.

Then I would, after I address those two issues, address the overall fairness, if it is appropriate to proceed that far.

So let's begin with the objection from Ms. Watson.

Let me just identify for the record what materials I have received in connection with this objection so that we know we are all dealing with the same fundamental filings:

I have an objection of July 24 from Mr. Cowles for Ms. Watson.

I have a supplemental memorandum of August 30.

I have the claim form for Ms. Watson.

I have the plaintiffs' response to this objection filed on September 23.

I have the Daily Harvest response filed on

September 23.

And I have the Stone Gate response filed on September 24.

Those are the materials.

Mr. Nace, you have had a chance to review the responses to your objections?

MR. NACE: Yes, your Honor, I did.

THE COURT: Okay. Good. I will hear from you.

MR. NACE: Thank you, your Honor. I will be try to be as succinct as I can anyway.

Ultimately we raised three concerns and objections to the proposed class action settlement.

The first has to do with the settlement and the allocation of funds and the idea that this settlement and the way the funds are being allocated runs afoul of the *Amchem* case that we identified, the Supreme Court, the *Amchem v. Windsor* case.

The second is the allocation model that's proposed does not provide objective criteria from which the objector or the claimants, Ms. Watson in particular, can understand precisely what she can reasonably be expected to obtain through the settlement. Furthermore, she doesn't understand how her claim will be evaluated as to causation, precisely how.

The third concern is that the appeals process for any dispute over what her claim should be isn't a real appeals

process. It simply goes back to the claims adjudicator, administrator himself, Mr. Gentle, to re-review his own decision.

THE COURT: So you understand now that that's not how the process is going to work?

MR. NACE: Which part?

THE COURT: Okay.

MR. NACE: I have seen that there is a new settlement agreement -- I'm sorry, the next settlement agreement has been proposed that the appeals process will go to the Court if there is an appeal. I have seen that.

THE COURT: Yes.

MR. NACE: I haven't seen that in this case in particular. We have been looking at that proposed class settlement, and I don't know if I have objections to that one or not at this time.

THE COURT: Okay. So any appeal that a claimant wishes to take from the administrator's decision can be taken to me.

MR. NACE: As to that, that is going to apply to this settlement as well?

THE COURT: Yes.

MR. NACE: That would resolve that issue for us.

THE COURT: Good. Thank you.

MR. NACE: Okay.

THE COURT: May I begin by just describing briefly what I understand the context to be of this objection.

As I understand it, your client consumed the product, which we have referred to as Crumbles, on May 14 and on a second occasion between June 11 and 12 of 2022.

The recall happened in June of 2022. She was tested by medical personnel and received notice that she had elevated liver enzymes. She was also diagnosed with hepatitis and liver -- I think it's described as infarction.

MR. NACE: Yes.

THE COURT: She had a liver biopsy on June 29, 2022. She is undergoing observation as of now as she continues to recover from her medical problems associated with the consumption of the Crumbles. From her recitation of facts, it appears to me that she was admitted to hospitals on two occasions, but that was less than clear to me.

Do I understand those facts correctly?

MR. NACE: Yes, your Honor.

THE COURT: Thank you.

And she filed litigation in Maryland state court. That was removed to federal court, and ultimately the case was transferred here to the Southern District of New York. She did not opt out, but she did file a timely objection. Because she remains a member of the class, I am addressing now her timely objection.

She is the only objection made from over 1100 claim forms that have been received. There is an objection, as I understand it, that the amount of her individual award has not yet been determined and will not be determined for some time and that it was unfair to her to have to decide whether to opt out or not until her final award has been decided.

Are you pursuing that claim, that objection?

MR. NACE: The timeliness part of it?

THE COURT: Yes.

MR. NACE: I would like more -- I did not -- we are not objecting to the idea that we have to know the exact amount. What we objected to was at this stage we don't have a reasonable range and how the category 5 enhancement awards will be allocated. That is a very gray sort of slush fund for her. In that way she can't have any kind of reasonable understanding of what her claim is actually worth.

THE COURT: Okay.

Of course, we have the advantage here not only of the written submissions by the settlement administrator but Mr. Gentle's presence in the courtroom. But it's my understanding that relevant category 5, which is created to make sure that there can be an individual assessment of whether in particular someone who falls within category 3 or within category 4 should be given more than the pro rata share of the settlement funds and that the settlement administrator won't

make that determination until there is an opportunity for claimants to make personal presentations and requests.

There is an individualized videoconference in which counsel can participate, and, if appropriate, the claimant will be given an opportunity to make additional written submissions, for instance, more detailed medical records perhaps or more recent medical records perhaps, and after that individualized assessment or individualized opportunity to be heard, the settlement administrator will create categories -- there may be as few as five, there may be as many as ten -- in which he will identify factors that are relevant to these claimants such that an equitable distribution can be made considering those factors.

Why I'm describing that, counsel, is because, first of all, if I've got it wrong, we should give everybody a chance to correct that. But more to the point, it's an individualized assessment that will take time. So there is no way to know as of today, much less the opt-out date months ago, whether or not your client will receive more than the $30,000 to which she can fairly expect to be compensated from the settlement.

MR. NACE: That's why we object, your Honor, precisely why. There is no way for her to know if she is going to get more, if she is going to be placed in category 5 at all.

THE COURT: Okay. I have that objection.

Anything else?

MR. NACE: Ultimately, your Honor, like we said in our submission, this settlement, the way it's been constructed, the way they want to allocate the settlement fund itself runs afoul of the *Amchem* case. We have multiple different categories of injuries, but there is one class member who's purporting to act on behalf of everybody, including people like my client who do not have the same injury as the class representative.

Personal injury classes may be able to be certified like this. However, there is usually a representative or subclasses with their own representatives, individuals advocating adequately on behalf of these disparate injuries.

Here we don't have that. The ultimate outcome is we have a client like mine who's going to be placed presumably, pursuant to the parties' submissions I think that it's not a big dispute that she's in category 3, although that hasn't actually been determined by the settlement administrator yet, the person who actually has the say. But I think, looking at it, we can all reasonably sort of assess she is in category 3, but the person who is settling her claim is in category 4, and the disparity in the award, the baseline award for those categories is significant to us.

And so looking at the *Amchem* case, a case where everyone in there had the same unity of interest in getting as much money as possible from the defendants in that case, and they all wanted to allocate it appropriately and fairly. They

were all trying to do the right thing.

I don't doubt that anyone here is acting in good faith and trying to do that as well too. That case did not satisfy 23(b)(3) or (a)(4). That settlement did not satisfy it because there were no subclasses drawn, there was not adequate representation, there were not individuals who had suffered the same injury for the injuries that were attempted to be allocated pursuant to the funds, pursuant to the settlement agreement.

What the Court said was there is no structural assurance of adequacy in the settlement because one person is trying to settle the claims of multiple subclasses or multiple categories of injuries, not just settle the claims, but determine the allocation of the settlement of those claims.

I know that case had 100,000 people; we have 1,000 people. That is immaterial. It is not about the raw numbers here. It is about the fact that there's disparate injuries, and there is a single class representative purporting to determine what is fair for people with very distinct injuries. As I said, I think it clearly runs afoul of *Amchem*.

The only other objection I will bring right now is, setting aside the appeals process -- you know, that one we can withdraw -- I was surprised in some of the response briefs to see that -- well, some of the defendants characterize it as a low bar for causation, and some of the briefs said there was no

need to prove causation.

The allocation model states that in order to be in category 3 even -- and I'm not even talking about category 5 -- that the settlement administrator has to be -- these are 289 claimants whose personal injury illness is verified to be causally related to the consumption of French Leek and Lentil Crumbles.

THE COURT: I looked at that. Thank you also. I think the wording here could have been improved.

MR. NACE: Okay.

THE COURT: This is my understanding. We are all gathered together here, so let's make sure that my understanding is right.

MR. NACE: Okay. I had the same desire.

THE COURT: Okay. Good. Thank you, counsel, for raising this.

Obviously the defendants had an opportunity if this were going to trial to litigate the causation: Did the consumption or would it be possible for the consumption of Crumbles to cause the kinds of injuries claimed here, including surgery, removing the gallbladder?

The defendants have settled this litigation. There is going to be no court determination regarding that, assuming settlements are approved here.

MR. NACE: Right.

THE COURT: It is my understanding that the settlement administrator is not going to be examining the scientific/medical issue of does consumption or did consumption of Crumbles cause hospitalization, illness, elevated enzyme levels, removal of the gallbladder, etc.

All that's going to be required to qualify for recovery from the settlement is a presentation of medical records and/or other documentation substantiating the kind of injury that plaintiffs claimed in this case was caused by the consumption of Crumbles.

Obviously if you've got notice here it's because you were on the subscription list from Daily Harvest and apparently were delivered Crumbles, and you had some kind of medical intervention or otherwise proof of an injury at or about that same time.

So it is not my understanding that your client would be at all disadvantaged. She has medical records, as I understand it, of at least two hospitalizations and these elevated enzyme levels, etc. and there's not going to be any requirement that she prove that those injuries to her health were scientifically verifiable in court as caused by the consumption of Crumbles. Let me just make sure that I understand correctly how this is going to work.

Mr. Marler, on behalf of the plaintiffs, is that your understanding?

MR. MARLER: Yes, exactly, your Honor.

THE COURT: And, Mr. Gentle, as the settlement administrator, is that your understanding?

MR. GENTLE: Yes, your Honor.

THE COURT: Does that address your concern, counsel?

MR. NACE: I mean, I want to make sure the defendants agree too, respectfully.

THE COURT: They actually only had to deliver the money, but let me ask Daily Harvest's counsel.

Mr. Jacobson, is that your understanding?

MR. JACOBSON: It is, your Honor.

And I can further say that the reason why that language was there -- and I concur with your Honor that we could have been clearer about it -- as we were sitting negotiating this it was at least theoretically possible that someone who consumed Crumbles in 2022 had their gallbladder out in 2024, prior to the settlement being approved, and the causal effect at that point could theoretically have been broken.

I don't think we ended up with anybody in that boat, but that was the concern, that there needed to be some temporal connection within reason. That's why that language was there.

But you are absolutely right, your Honor, that so long as everything happened in the same general sequence, that's the understanding of the defendants.

THE COURT: And is that true for you, Mr. Baiocco?

MR. BAIOCCO: Yes, your Honor. Thank you.

THE COURT: Thank you.

So I think that leaves as your objection the *Amchem* objection. Am I right, counsel?

MR. NACE: I want to put one very fine point on that last issue.

THE COURT: Sure.

MR. NACE: I just want to make sure, medical records this is how they're always written. No one ever writes, "Ms. Watson got sick, it was caused by Crumbles." That's not what we are talking about here, right?

THE COURT: Absolutely.

MR. NACE: We are talking about she has liver failure, stage whatever. It is within the reasonable time of consumption.

THE COURT: Absolutely.

MR. NACE: That's it?

THE COURT: That's right. That is the agreement.

MR. NACE: Again, I am going by what I read here, and I am maybe being overly cautious for my client, but if that's how it is going to be interpreted, I think that -- at least as to category 3, now the separate issue is the causation as to category 5, which, as I said, I still don't know, and we agree, I can't know if she's even in it or how much that's worth.

THE COURT: That's right. Part of the settlement

included an ability for people to get extra money, particularly in categories 3 and 4, because their injuries have been shown in a verifiable way that they deserve more than the typical category 3 or the typical category 4 claimant who is receiving a recovery. I think this is a creative way and, with full appeal rights, a fair and equitable way to make distinctions to give people more money when that is appropriate.

MR. NACE: Okay. I understand, your Honor. We maintain our objection to that part of the settlement agreement and the motion for final approval.

THE COURT: Thank you very much.

Now, with respect to the factors, there is only one named class representative, and there aren't subclasses here based on, for instance, a subclass of individuals who had the gallbladder removed. I want to give plaintiffs' counsel an opportunity to be heard, but it's my understanding that, though we have only one named class representative as part of the settlement class, that in fact the settlement was negotiated by a group of five lawyers/law firms who represented close to 500 claimants. I assume in that set of -- let me be precise here, 479 claimants. They represent the different categories of injury.

We didn't have 479 gallbladders removed here, far from it. The settlement was negotiated by counsel who had filed 90 different lawsuits in federal or state courts. Therefore, even

though there's one named representative, lawyers who negotiated this settlement represented the full range of claimants in terms of the different kinds of damages.

But, Mr. Marler, I just want to make sure I understand this correctly.

MR. MARLER: You understand that part correctly, your Honor. Also, I might add that not only was it the five lawyers representing the class throughout this process from the very beginning, I had access to all of the lawyers who had claims, who filed claims of any sort with Daily Harvest.

One of the things I did, and probably annoying to many of my colleagues, was I kept them completely informed as to what we were doing. So not only was this settlement negotiated by the lawyers sitting here, but with the involvement of 40 other lawyers, 40 other law firms who represented a wide variety of people, maybe just one person, maybe five people. I tried to keep all of those people involved.

When we signed the term sheet, which eventually became the settlement agreement, it was signed by 39 or 40 lawyers who I had been in contact with. So it had a wide variety of lawyers who had their own special interests with their own clients. So it was not just the group of lawyers who represented the bulk of people with a wide variety of injuries. It was a much larger group of people.

THE COURT: So among the five lawyers whose names have

been listed as class counsel, did they represent claimants at each level of compensation here?

MR. MARLER: Yes, your Honor.

THE COURT: So categories 1A and B, 2, 3 and 4?

MR. MARLER: Yes. To be honest with your Honor, the bulk of those were in categories 2 and 3.

THE COURT: The number of people who actually had the gallbladders removed, which is a very serious or potentially very serious issues, was few and far between given the number of claimants overall?

MR. MARLER: Yes, your Honor.

THE COURT: Mr. Nace, is there anything else you want to say?

MR. NACE: I will just say, your Honor, as to that point, it doesn't alleviate our concern, and I don't think it cures the problem. We have one class representative. There should have been people with disparate injuries.

The plaintiffs, the parties settle cases, not lawyers, right? They should have been in those calls, mediations, etc. It doesn't cure the problem under *Amchem*, and it doesn't cure the problem for me practically that only one plaintiff, only one claimant had a seat at this table.

THE COURT: Yes. Thank you.

I am taking that into account, but I know that your client is the only objector and there are over a thousand

claimants. So many people, including people who are unrepresented, have had an opportunity to object and have not.

Okay. Thank you very much.

MR. JACOBSON: Your Honor, if I may, in order that the record might be clear in the event there is an appeal from this, I think that your Honor's points with regard to the plaintiffs' counsel and the clients that they were representing being involved with this are very salient and absolutely relevant.

I understand the objector's point that there is only one class representative here, and if there were true tension as among the categories, that might be a relevant point. But this is not *Amchem*.

I can't believe that we have actually had a conversation this long about *Amchem* and nobody has used the word "asbestos." The context of *Amchem* was a huge number of disparate types of injuries with regard to asbestos.

Here, it is one type of -- it's one set of facts. It is a few different kinds of injuries that arise from those facts, but I think just by virtue of the objector coming back to that point I just wanted to note for the record that it is not just that the lawyers had a fiduciary obligation that they adhered to, it's that there really is no conflict among the classes.

THE COURT: Yes. And I think the briefs submitted in

response to this objection make that point over and over again. This is one product, not multiple asbestos products. The injuries that have been suffered were close in time to the consumption of the Crumbles. The one product at issue here from one manufacturer.

So, yes, I find that *Amchem* can be easily distinguished.

Thank you very much.

I appreciate, Mr. Nace, your traveling here and taking the time and opportunity to make your objection known to me.

Thank you.

MR. NACE: Thank you for your time, your Honor.

THE COURT: Yes.

So a woman named Aleta Reese seeks to opt out. It is possible to construe her submissions as an objection too, but I think it's fair to conclude that her first and foremost request is to opt out.

Let me review what papers I have received in connection with this request:

I have an objection to the settlement dated October 4.

I have a notice of motion and for leave to opt out dated October 8.

I have a submission of October 8 from Daily Harvest.

I have considered a declaration from the settlement administrator of October 11.

I have the plaintiffs' response to Ms. Reese's objection from October 11.

I have a response of October 11 on behalf of Stone Gate.

I have a supplemental declaration of Ms. Reese of October 14.

And I have today's letter, October 14, from Ms. Reese.

Based on the submissions I glean the following:

Ms. Reese went to the emergency room on May 25, 2022. She suffered severe jaundice. She has some medical costs and seeks recovery of lost wages.

She filed a lawsuit in San Diego state court on May 24 of this year. There is a question about whether or not Daily Harvest was served effectively.

I have looked at the affidavit of service. It is unclear to me precisely what happened in terms of service on Daily Harvest. There is apparently a July 2, 2024, mailing to 99 Hudson Street in New York City. There may also have been personal service on that date, which is called substituted service. I am not quite sure.

Stone Gate was also sued, and on August 28 it removed the lawsuit to federal court.

Now, back in 2022, Ms. Reese sent an e-mail to Mr. Marler. In that e-mail she indicated she was represented by an attorney. That attorney appears to be a Mr. Slattery.

He also submitted an e-mail this month, October 3, 2024, on behalf of Ms. Reese.

Defense counsel have submitted some documentation indicating that Mr. Slattery and Ms. Reese may be married or in a relationship with each other, but otherwise have a close connection.

The date for opting out here was July 24, 2024.

Ms. Reese made her first request to op out on October 8, 2024, so over two months late.

The date for objecting was September 2, 2024.

She made her objection, to the extent it's considered an objection, on October 4 of 2024, so about a month late.

She was provided notice of this class action settlement and the opportunity to opt out or object or file a claim if she did not opt out.

Two e-mails were sent by the administrator to her e-mail account on June 19, 2024, and August 25, 2024. Those e-mails were received by her e-mail account. She has presented evidence that the second of those e-mails went into her spam account.

The parties here, the plaintiff and plaintiffs' counsel and the two defendants, take the position that it is far too late to approve an out-of-time opt-out. As will be discussed later, when we get to the substance of the settlement, there was a not-unusual agreement between the

parties to see how many opt-outs there would actually be that would have an impact on the settlement and any amount withheld from the general settlement fund and reserved to deal with opt-out claims.

So notice in October of a desire to opt out was too late under that timetable. It would have had a material impact on the terms of the settlement the parties have reached.

There are many issues to address. Fundamentally, this is a question about adequacy of notice. None of the parties involved here before me would object to Ms. Reese participating in the settlement and me giving her a period of time by which she could submit a claim form after I rule, and I expect I'm prepared to follow that route.

My understanding is -- and I would like more information from Daily Harvest and Stone Gate about this -- that the e-mail addresses that were provided to the settlement administrator were provided by Daily Harvest, and they were e-mail addresses that Daily Harvest subscribers used when they ordered the particular product at issue here, Crumbles.

Therefore, one would expect that if you use the same e-mail address you are making effective service to anyone who might have a claim that they were injured through consumption of the product Crumbles. But I want to make sure I understand that correctly.

I have another question for Daily Harvest and Stone

Gate and also for plaintiffs' counsel. We have many more claimants here, roughly double the number of claimants that we expected, which is further evidence that notice was indeed effective and was, as the parties anticipated, a good means of reaching each and every individual who may have had an injury and may seek to recover as a result of that injury.

But my second question is, is there anyone that has given notice to Daily Harvest or Stone Gate by filing a lawsuit or otherwise who hasn't made a claim here?

Do we understand that there's anyone else who thinks they were injured -- other than Ms. Reese and the opt-outs who have been accounted for, and we have a list of them -- is there anyone else who's made their position known and is not represented either by an opt-out notice or a submission of a claim here?

MR. JACOBSON: Your Honor, I can answer almost all of your questions on my feet right now.

Number one, your Honor is correct that the notice list was provided by Daily Harvest and is reflective of the e-mail addresses that people used to create accounts with us and to place orders for Crumbles. Stone Gate can confirm this, but it is our e-mail list.

We augmented that list so that if someone had surfaced with a claim and surfaced through counsel, notice was also provided to that counsel. As Mr. Marler said, a lot of those

counsel were already at table with us negotiating the settlement, but if there were other lawyers involved, notice was given to those lawyers directly.

THE COURT: You added those names when Daily Harvest or Stone Gate had been contacted and knew of those individuals?

MR. JACOBSON: Correct, your Honor.

I am 99 percent certain, and I can confirm no later than tomorrow morning in a letter to the Court if necessary, that the only pro se complaint, purported pro se complaint was from Ms. Reese.

I have not looked at and I don't know that my colleagues have looked at the list of claimants to compare those that filed lawsuits to those who have filed claims. I believe that everyone who filed a lawsuit has filed a claim. The only pro se --

THE COURT: Or has opted out.

MR. JACOBSON: Or has opted out.

I believe the only pro se was Ms. Reese. We did not notice that she had not filed a claim. I know Daily Harvest did not.

Not only, your Honor, did we all agree that we would not have a problem if your Honor allowed her to file a claim out of time, we have been in communication with Ms. Reese. The moment she surfaced, we told her she would be able to file a claim out of time. We strongly encouraged her to file a claim.

I communicated with her myself. And we tried to explain to her how this process was going to work and to make sure that she was aware of that option. So she is expecting the Court give her that opportunity we are all expecting the Court to give her that opportunity. That should be I think the right answer, your Honor.

While I am on my feet, your Honor, Mr. Marler is not going to say this himself. He had back surgery, and I think getting to his feet is a little harder for him than it is for me. I know he intended no disrespect when your Honor motioned him upwards.

THE COURT: Thank you. No one has to stand if there is an impediment to them standing.

I assure you, Mr. Marler, you are no exception to that general rule. I hope your recovering well from surgery.

MR. MARLER: Thank you, your Honor.

THE COURT: So before I hear from Mr. Marler, Mr. Baiocco, is there anything you wanted to add?

MR. BAIOCCO: No. We can also confirm that that's where the e-mail list came from and that we were pleasantly surprised that it seemed to work when well over a thousand people come out in response to the notice. I think that's probably the best evidence we have here.

THE COURT: So, Mr. Jacobson, when did your communications with Ms. Reese, your direct communications

begin?

MR. JACOBSON: The day she submitted the first filing with the Court, she also e-mailed me those filings. I responded and copied all of the counsel, most or all of the counsel you see here and made clear to her I am not her lawyer. I'm Daily Harvest's lawyer.

I let her know that by virtue of her being a member of a certified class she had the ability to reach out to plaintiff's' counsel, and they could counsel her further. I just tried to be as helpful to her as possible because I wanted to let her know that we were going to be opposing her request to op out for the reasons your Honor stated. And I wanted to let her know that it was not our intention to, you know, cause her to get nothing. We wanted to make sure that she would have this other opportunity to participate in the settlement.

THE COURT: So the first filing I have is October 4. So that's roughly the time frame in which you first talked to her?

MR. JACOBSON: Yes. I have had no oral communications with her. All of my communications have been by e-mail.

THE COURT: Okay.

MR. JACOBSON: She called one of my colleagues and left a message, but we have only responded to her in writing.

THE COURT: Okay. Thank you.

Mr. Baiocco, I notice that Stone Gate got notice of

her lawsuit sometime before August 28 when you removed the litigation. Do you want to give me more facts about that?

MR. BAIOCCO: I know that we did receive it before that time, and we were always trying to coordinate with Daily Harvest as to when we were going to remove, when cases came in at different parts of the country, when we were going to remove and have them transferred here.

THE COURT: Okay.

So, Mr. Marler, can you fill in anything that you think would be helpful.

MR. MARLER: I think a couple of things.

The five opt-outs that remain, none of those have filed lawsuits. In other words, I think there -- none of those have filed lawsuits. All of the lawsuits are accounted for within the claims process except for Ms. Reese.

With respect to, I have a lot of conversations with clients, my clients, and nobody expressed any concerns about not getting notice from the claims administrator. In fact, they got notice and contacted me as soon as they got notice. So I was getting several hundred phone calls.

THE COURT: Okay. I can be more specific about the numbers here. It means that over 700 people have filed claims who did not have counsel. Therefore, their only means of notification was through the Daily Harvest e-mail notification that the settlement administrator provided.

I am going to deny this request to opt out as untimely. I expect I will file a decision setting forth my reasoning in more detail.

Obviously, electronic notification is permitted by the federal rules to the class and by decisions, including by circuit courts. I have to find that the notification protocol that we followed here was reasonable and designed to accomplish actual notice to absent class members.

I find it was reasonable and was so designed and actually had that impact. Hundreds of claims have been filed because of that notice protocol. It prompted a widespread reaction from absent class members, people have been able to participate in this recovery. I did find it adequate, and I do find it adequate again based on this additional information counsel have provided today.

Obviously, there was a website available for months. Anyone who wanted to follow the progress of this case, including reading the settlement agreement, reading the notice to the class, reading the deadlines that pertained to them and their choices, that was all readily available, even if you didn't get an e-mail.

Here is someone who contends that she was so injured by her consumption of Crumbles that she filed her injury lawsuit this May. She appears to be someone who is assisted now and again by an attorney, though she has made various

submissions pro se. She had a working e-mail address that is the e-mail address that the settlement administrator has used. It's the e-mail address she used to order the product. It's the e-mail address from which she is now communicating with counsel and to some extent the Court.

The fact that her particular or at least the second notification went into spam is sad, but it doesn't relieve or suggest to me that the protocol for notice didn't meet the requirements of the federal rules and of due process and was reasonable in the circumstances.

So I am going to give her two weeks to submit a claim form after I issue an order. I am going to require counsel to serve that order on her.

I guess, Mr. Jacobson, you are in e-mail communication with her.

MR. JACOBSON: We are going to e-mail it to her. We are going to overnight it to her. We will make sure she is served.

If I may very briefly, your Honor.

So the settlement, assuming your Honor grants final approval to the settlement, it will become final in due course. In the meantime, Ms. Reese's lawsuit, pursuing it is in violation of the injunction in the Court's preliminary approval order.

I am not asking your Honor to do anything, but within

the next day or two we and/or Stone Gate will be filing a motion in the Southern District of California asking for that to be stayed. I just want to make sure your Honor is okay with that course of action.

THE COURT: Absolutely.

MR. JACOBSON: Thank you, your Honor.

THE COURT: I don't know. It is my injunction. It might be that your motion should be before me, but counsel will decide.

MR. JACOBSON: She is before you having put herself here. We could do that. It is going to have to hand with the Southern District of California judge anyway, and I thought it might be -- I don't know how it would land with the Southern District of California district judge to have an order from your Honor. But if your Honor has a view on that, we will be happy to pursue what your Honor suggests.

THE COURT: Counsel will figure out where to file the motion.

MR. JACOBSON: Understood, your Honor.

THE COURT: Let's turn to the fairness hearing review more generally.

I need to give everybody an opportunity to be heard.

I am going to make detailed findings here, but if anybody wants to add to their written submissions, I want to give you that opportunity.

Mr. Marler, is there anything that plaintiffs' counsel, you or one your colleagues wishes to add?

MR. MARLER: On behalf of myself, no, your Honor.

Thank you.

MR. GENTLE: Your Honor, I have two corrections.

I think there's eight opt-outs and not five.

Also with all due respect, your Honor, the claim form, it's straightforward, but I think 30 days is probably more fair than two weeks for Ms. Reese.

THE COURT: Thank you.

Yes. In terms of opt-outs I think 13 were filed, 5 were revoked, and so 8 remain.

MR. GENTLE: That's correct, your Honor.

THE COURT: I will give Ms. Reese 28 days, four weeks.

MR. GENTLE: Thank you, your Honor.

THE COURT: So, Mr. Jacobson, is there anything you wish to add before I turn to the substance of the review?

MR. JACOBSON: Only to thank and congratulate my colleagues around the table, your Honor. This was a very challenging settlement with a lot of moving parts.

We could not have done it without your Honor.

We could not have done it without Judge Cave.

We could not have done it without the assistance of the mediator.

But we also couldn't have done it without rolling up

our sleeves and cooperating in a hard-nosed way in service of our clients. This is a good group. We did well.

And we thank your Honor for your time.

THE COURT: Thank you.

Mr. Baiocco?

MR. BAIOCCO: We will rest on our papers and just thank you, your Honor.

THE COURT: There's much gratitude to be shared on behalf of class members who have obtained this recovery, but Mr. Marler has been the one who's I think taken upon himself a lion's share of the work. I know counsel will speak more directly and personally to him, but he has my thanks for all he's accomplished here on behalf of everyone.

So we have terms of the settlement, which are just shy of $23 million, $22,999,000, to be divided among categories of damages and within those categories prorated among the claimants who fit within those categories, with an opportunity for enhancement of individual awards pursuant to a process which will be overseen by the settlement administrator.

As we now know, the two remaining defendants, Smirks and Molinos have also reached a preliminary settlement or they have reached a settlement which has received preliminary approval, and that fairness hearing is for the future.

I have to decide about the fairness of this settlement by applying the requirements of Rule 23(e)(2), the Second

Circuit decisions in *Moses v. New York Times*, *Goldberger*, and *Grinnell*.

I have to consider the 23(e)(2) factors holistically. I have to review the terms of the settlement and any fee award in tandem with that review. I have to review the settlement both for procedural and for substantive fairness.

Let me turn to procedural fairness first.

The first issue is whether the class representative and class counsel have adequately represented the class.

Yes, they have done an admirable job here. As Mr. Marler has explained, it has been a collaborative process among many counsel for present and absent class members, class members, all of whom have claimed injury from consumption of Crumbles, but some of those injuries have been more severe than others, and all those voices have been heard.

The second issue is whether the proposal was negotiated at arm's length. It was, and with the assistance of Magistrate Judge cave. I know counsel have given her their thanks, and I do as well.

Turning to issues of substantive fairness, the Second Circuit has advised that the *Grinnell* factors remain a useful framework for considering substantive fairness. I find that the relief provided to the class is adequate.

I must take into account, first, the costs, risks, and delay of trial and appeal. In that connection I have to

consider the complexity, expense, and likely duration of the litigation. Though this was a products liability case, there are many cases filed as individual cases, and issues of causation were at the center of this litigation, and there was no court ruling with respect to that issue.

The ultimate litigation of that issue and the other issues associated with this litigation would have been expensive. It wouldn't have been over. We would have had *Daubert* practice, summary judgment practice, and, if it all survived, a trial and then appeals.

The next issue is the notice provided to the class.

In that regard notice first went out in June of this year, June 19 of 2024. A comprehensive e-mail list was created by Daily Harvest. It included every e-mail account from which this product had been ordered. If any of those e-mails bounced back, there was an additional mailing made by U.S. mail to the address.

There was a website posted. 5400 separate individuals visited that website. The number of e-mails sent was close to 21,000.

I should say I find the notice, as I've already indicated, to have been reasonable and adequate in the circumstances and designed to provide individualized notice to anyone who suffered an injury here.

I guess at its heart the issue is whether an

individual mailing through the U.S. mails should have been made by the settlement administrator whenever an e-mail was not indicated as having been opened. Only about half the e-mails were indicated as opened. Mail was not sent except when there was a bounce-back. In the best of all possible worlds perhaps individual mail should have been sent or could have been sent, but I don't find that due process or the federal rules required that reaction.

For the reasons I've already explained, this was a sound proposal that I adopted and found to be fair and it's had reaction from the class indicating that actual notice was effected and allowed many more claims to be made than already made through the filing of lawsuits or by the retention of counsel.

We have 1,188 claims filed of those claimants who are represented by counsel in 479 cases. There were roughly 90 lawsuits filed. We have only had one objection, which I have heard today, and I thank counsel again for coming to Court to make that objection. We've had 13 opt-outs, 5 of those were revoked after consultation with the settlement administrator or others, leaving us with 8 opt-outs. In my experience with respect to oversight of settlement class actions, this is a very positive reaction of the class and very substantive endorsement of the settlement terms.

The next issue is the stage of the proceedings and the

amount of discovery completed. Much fact discovery had been done. As I understand it expert reports have been exchanged. We were close to the end of the fact discovery period when the settlement was reached. Medical records by many claimants and/or plaintiffs had been served and were available to be reviewed so that everyone was in a position to understand the nature and scope of the injuries.

The next issue is the risk of establishing liability. It is hard for me to evaluate. I didn't review the expert reports, which I would have done if *Daubert* motions had been made. I think there was some challenge with establishing liability, but I expect it was not an insurmountable challenge.

The next issue, the risk of establishing damages. I don't think that risk was very great. There were serious injuries, at least by some class members. So once causation was established through expert testimony, I think damages could have been established.

The next issue, the risk of maintaining a class action through trial. Well, this wouldn't be a class action. Individual actions wouldn't have been litigated as a class action.

The ability of the defendants to withstand a greater judgment. That is hard for me to evaluate, though I note that the two defendants before me submitted the entirety of their insurance coverage for this event to the settlement fund.

The next issue is the range of reasonableness of the settlement fund in light of the best possible recovery. I find it is very reasonable.

The next issue is the range of reasonableness of the settlement fund to the possible recovery in light of all the attendant risks of litigation. Again, I find that it is reasonable.

The next factor I have to address under the case law is the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims.

This has already been discussed today in the context of addressing the one objection made. I find it's reasonable and indeed adds to the fairness of the relief that will be distributed, permitting a more individualized and fine-tuned assessment of degrees of injury.

Next, the terms of any proposed award of attorneys' fees, including the timing of payment.

Here, no attorneys' fees are being sought. Counsel will be paid per their retainer agreements with their clients. Any pro se recovery will be reduced as described in the settlement agreement by an assigned attorneys' fee percentage so that there will be no unfairness in distribution.

However, plaintiffs' counsel seeks reimbursement of $33,333.33 for advanced costs associated with notice, and I

will approve that.

There is a suggestion in the proposed final judgment that the balance of any holdback amount be deposited into the settlement fund after a certain date. I need that date from counsel. This might need to be something addressed by defense counsel, but it's paragraph 11 of the final judgment. There is a blank left there. I don't know what is reasonable in the circumstances.

The next issue is any public policy considerations associated with attorneys' fees.

There are none for reasons I have just explained.

I am next required by Rule 23(e)(3) to identify any separate agreement. I believe the only separate agreement is the holdback agreement.

Am I right, Mr. Marler? No other agreement?

MR. MARLER: Correct, your Honor.

THE COURT: Thank you. And the holdback agreement is described in the submissions to me, and I approve it as reasonable.

The final factor I have to address is whether the settlement proposal treats class members equitably relative to each other.

Of course, this doesn't require identical treatment but equitable treatment. I find it does. To the extent that any individual decision by the settlement administrator can't

be resolved by a further discussion with him, class members will have a right to appeal an adverse decision to this Court.

I think that ends my review as required by Second Circuit law and Rule 23(e), but let me just make sure there's nothing anyone else wishes to raise here today.

Mr. Marler?

MR. MARLER: No, your Honor. Thank you.

THE COURT: Mr. Gentle, just anything you want to add?

MR. GENTLE: No, your Honor.

THE COURT: Thank you. Thank you for your service to the class.

MR. GENTLE: A great pleasure.

THE COURT: Mr. Jacobson?

MR. JACOBSON: No, your Honor.

THE COURT: Mr. Baiocco?

MR. BAIOCCO: No, your Honor. Thank you.

THE COURT: I should add that Mr. Gentle is a very experienced administrator and his résumé reflects the amount of work that he's done in this case and in other cases, and I think he's well equipped to administer this settlement fairly. But, again, to the extent that anyone has a complaint, I'm ready to hear and evaluate those complaints.

Thank you, all.

(Adjourned)